UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------
RALPH ROMANO,

                 Petitioner,

           - against -


  TINA M. STANFORD,

               Respondent.
--------------------------------------------------------------

                         **MEMORANDUM & ORDER**
                         16-CV-5884 (RPK)

RACHEL P. KOVNER, United States District Judge:

Petitioner Ralph Romano, a state parolee, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner alleges that prosecutors falsely represented that the doctor who performed the autopsy of the murder victim was unavailable to testify at trial. In addition, he alleges that prosecutors presented false testimony to authenticate a vehicle report and withheld evidence that would impeach the report. As explained below, petitioner's claims are time-barred. Accordingly, the petition is denied.

## BACKGROUND

Petitioner is on parole from a prison sentence for killing John Spensieri. *See* Aff. of Richard Levitt in Supp. of Petition for Writ of Habeas Corpus (Dkt. #1) ("Aff. of Richard Levitt"); Parolee Lookup, New York State Department of Corrections and Community Supervision, https://publicapps.doccs.ny.gov/ParoleeLookup/default (last visited May 3, 2022). A jury first convicted petitioner of second-degree murder in 2003, but the verdict was set aside due to juror misconduct. *See People v. Romano*, 8 A.D.3d 503, 503 (N.Y. App. Div. 2004), *leave to appeal denied*, 818 N.E.2d 681 (N.Y. 2004). Petitioner was then retried in 2005 and again

convicted of second-degree murder.  Aff. of Richard Levitt Ex. L 331 (Dkt. #1-18).[1]  The trial

court sentenced petitioner to imprisonment for 18 years to life.  *Id.* Ex. L 353 (Dkt. #1-18).  The

Appellate Division affirmed, *People v. Romano*, 50 A.D.3d 1162 (N.Y. App. Div. 2008), and the

Court of Appeals denied leave to appeal, *People v. Romano*, 896 N.E.2d 106 (N.Y. 2008),

*reconsideration denied*, 900 N.E.2d 857 (N.Y. 2008).  In 2015, petitioner filed a motion to vacate

his conviction under New York Criminal Procedure Law § 440.10.  Aff. of Richard Levitt Ex. C

1-2 (Dkt. #1-3).  The Supreme Court, Queens County, denied the motion on April 15, 2016, *see*

*id.* Ex. A 13 (Dkt. #1-1), and the Appellate Division denied leave to appeal on August 30, 2016,

*see id.* Ex. B 1 (Dkt. #1-2).  Petitioner filed his federal habeas petition on October 21, 2016.  *See*

Dkt. #1.

## I.     Evidence at Trial

At petitioner's 2005 trial, prosecutors argued that petitioner killed Spensieri for hiring an

employee who had recently quit a job at petitioner's company.  *See* Aff. of Richard Levitt Ex. L

147-150, 157 (Dkt. #1-14); *id.* Ex. L 203-04, 214-15 (Dkt. #1-18).

Prosecutors called several key witnesses.  Petitioner's ex-wife, Deborah Samuel, testified

that petitioner had become enraged when he learned that the employee had left his company to

work for Spensieri.  *Id.* Ex. L 61 (Dkt. #1-16).  She testified that learning this information,

petitioner directed her to call petitioner's friend and associate Ben Ianniello.  *Id.* Ex. L 61-62

(Dkt. #1-16).  According to Samuel, petitioner got on the phone with Ianniello.  *Id.* Ex. L 65-67

(Dkt. #1-16). Samuel testified that petitioner took his Glock handgun from a drawer in the

bedroom and left the house with it.  *Id.* Ex. L 74, 77 (Dkt. #1-16). According to Samuel,

---

[1]    Citations to documents in the record follow the pagination assigned by ECF rather than the documents' internal
pagination.

petitioner returned home later the same night with blood on his shirt and face. *Id.* Ex. L 78 (Dkt. #1-16).

Ianniello also testified. Ianniello stated that on June 7, 1989, he drove petitioner to Spensieri's home in a red 1988 Chevrolet Corvette convertible registered to Ianniello's wife Linda. *Id.* Ex. L 112, 116-18 (Dkt. #1-15); *see id.* Ex. L 156 (Dkt. #1-15). According to Ianniello, he and petitioner spoke with Spensieri in the kitchen for an hour. *Id.* Ex. L 124-30 (Dkt. #1-15). Ianniello then recalled that petitioner and Spensieri walked into a dark room off the kitchen. *Ibid.* After a few minutes, Ianniello allegedly heard about half a dozen gunshots. *Id.* Ex. L 130-31 (Dkt. #1-15). He also allegedly heard Spensieri exclaim, "You motherf----er." *Ibid.* A minute after the gunshots, according to Ianniello, petitioner emerged from the basement alone and stated, "Let's get the f--- out of here now." *Id.* Ex. L 131-32 (Dkt. #1-15). Ianniello testified that he and petitioner then got back in the Corvette. *Id.* Ex. L 133-34 (Dkt. #1-15). Ianniello recalled driving the car as petitioner instructed him on where to go. *Ibid.* As Ianniello was driving, he allegedly saw petitioner disassembling a firearm and throwing the pieces out the window. *Id.* Ex. L 135-36 (Dkt. #1-15).

Christopher Burch, who at the time of the murder was ten years old and lived across the street from Spensieri, *id.* Ex. L 340, 345 (Dkt. #1-16), corroborated parts of Ianniello's testimony. Burch testified that he saw petitioner, Spensieri, and another man talking outside the entrance to Spensieri's kitchen on the evening of June 7, 1989. *Id.* Ex. L 345-46 (Dkt. #1-16). Burch also saw a red Corvette convertible parked close to Spensieri's house. *See id.* Ex. L 348-49 (Dkt. #1-16). Burch had seen petitioner driving the car on several previous occasions, and thought that the car belonged to him. *See id.* Ex. L 348-49 (Dkt. #1-16).

Prosecutors introduced evidence relating to the red Corvette in order to corroborate Ianniello's account.  Ianniello testified that, at petitioner's insistence, he went to the motor vehicles office in Long Island within a week after the murder.  *Id.* Ex. L 150-52 (Dkt. #1-15).  There, Ianniello allegedly changed the plates on the red Corvette convertible.  *Ibid.*  Ianniello recalled that the old license plate contained the numbers 577 and that the new license plate contained the numbers 523, but he did not recall the letters for either plate.[2]  *Id.* Ex. L 117, 152 (Dkt. #1-15).

To corroborate Ianniello's testimony, prosecutors introduced evidence about the car Ianniello drove.  First, prosecutors introduced a "Plate History Inquiry" printout dated November 12, 1998, from the Summons Tracking Accounts Receivable System ("STARS") database.  *Id.* Ex. P (Dkt. #1-22); *see id.* Ex. L 326, 332 (Dkt. #1-15).  Mary Gotsopoulis, the Deputy Chief Administrative Law Judge ("ALJ") for the New York City Department of Finance, Parking Violations Bureau, gave testimony to allow the record's admission as a business record.  *Id.* Ex. L 326, 328-30, 332-33 (Dkt. #1-15).  She explained that STARS contains (**i**) "all information for [parking] summonses and violations issued in New York City"; (**ii**) plate information on various plates that . . . those summonses belong to"; and (**iii**) "information regarding all [vehicle license] plates that are issued in New York City that have changes made on them," updated on a weekly basis with information from the State's Department of Motor Vehicles.  *Id.* Ex. L 327-29 (Dkt. #1-15).  Gotsopoulis described the November 12, 1998 printout as "a plate history that's made from . . . STAR[S]," which "[t]ells us who the plate is registered to" and "gives us the

---

[2]  Based on the license plate history evidence outlined below, prosecutors may have been expecting Ianniello to say that the old license plate number contained the numbers "877."  The prosecutor responded as follows: "577. Is there anything I could show you that would refresh your recollection?"  *Id.* Ex. L 117 (Dkt. #1-15).  Ianiello responded, "The license plate."  *Ibid.*

registration expiration date, the VIN number, and the make and model of the vehicle." *Id.* Ex. L 332, 338 (Dkt. #1-15).

She testified that the record showed that a red 1988 Chevrolet convertible was registered to Linda J. Ianniello with license plate number XBF877, effective October 20, 1988, and expiring on October 19, 1989. *Id.* Ex. L 339-40 (Dkt. #1-15); *see id.* Ex. P (Dkt. #1-22). Gotsopoulis testified that the document shows that although the vehicle did not change ownership, the vehicle was assigned a new license plate with number 2ER523, effective June 13, 1989—less than a week after the murder. *Id.* Ex. L 340-41 (Dkt. #1-15); *see id.* Ex. P (Dkt. #1-22).

Prosecutors also submitted a "Certification of Records" for the 1998 printout that was signed by Gotsopoulis. *Id.* Ex. R (Dkt. #1-24); *see id.* Ex. L 333 (Dkt. #1-15). The document stated that Gotsopoulis certified that the 1998 plate-history printout "is a printout from the STARS system, which is a database of records, that the records were made and kept in the regular course of business of the Department of Finance, and that it was the regular course of business of the Department of Finance to make and keep such records at the time of the events they record or within a reasonable time thereafter." *Id.* Ex. R. Neither Gotsopoulis' in-court testimony nor her written certification states that Gotsopoulis prepared or generated the November 12, 1998 plate-history record.

As relevant to petitioner's habeas claims, prosecutors also introduced some ballistics evidence. Police analyzed nine shell casings recovered from the murder scene. *Id.* Ex. L 208-09 (Dkt. #1-17). Firearms expert David Delarosa testified at trial that he believed the shell casings were all fired from the same weapon: a Glock-type 9 mm semi-automatic handgun. *Id.* Ex. L 212-14 (Dkt. #1-17). Delarosa's analysis of materials recovered from two deformed 9 mm bullet

fragments and one unknown caliber deformed piece of copper jacketing recovered from Spensieri's body was less conclusive. Delarosa testified that he could not conclusively say that the bullet fragments and deformed piece of copper jacketing were, in fact, fired from the same firearm—even though they shared many similarities, had the same caliber as the shell casings, and had characteristics consistent with having been fired from the same weapon. *Id.* Ex. L 224-28 (Dkt. #1-17).

Finally, prosecutors introduced some evidence regarding the autopsy of Spensieri. Dr. Ernst Jean of the Office of the Chief Medical Examiner had conducted that autopsy. But according to petitioner, prosecutors represented at petitioner's trials that they could not locate Dr. Jean. Mem. in Supp. of Pet. for Writ of Habeas Corpus 13-14 (Dkt. #2) ("Pet'r's Mem."). Dr. Kari Reiber—a forensic pathologist formerly employed by the Office of the Chief Medical Examiner of New York City—instead testified about the autopsy results. Aff. of Richard Levitt Ex. L 82-86 (Dkt. #1-17). She explained that Dr. Jean had conducted the autopsy, in the presence of another doctor, on the morning after the murder. *Id.* Ex. L 86, 120 (Dkt. #1-17). Consistent with Dr. Reiber's testimony, a "Case Worksheet" form concerning Spensieri's death memorialized that (**i**) the form was filled out on "6/8/89" at "9:20" in the "AM", and (**ii**) the "Medical Examiner" was someone named "Jean." *Id.* Ex. W (Dkt. #1-29); *see id.* Ex. L 86, 120 (Dkt. #1-17). Dr. Reiber explained that she did not know Dr. Jean and that neither Dr. Jean nor the other doctor still worked at the Office of the Chief Medical Examiner. *Id.* Ex. L 86-87, 90 (Dkt. #1-17). Dr. Reiber stated based on her review of the autopsy findings and other associated material that Spensieri died of "[m]ultiple gunshot wounds to the head and torso with injuries to the brain, to the liver, and to the right lung." *Id.* Ex. L 86-88, 135 (Dkt. #1-17).

Dr. Reiber testified about Spensieri's time of death.  According to Dr. Reiber, a medical investigator from the Office of the Chief Medical Examiner had examined Spensieri's body between 2:30 a.m. and 3:00 a.m. on the morning after the murder and found no rigor mortis present.  *Id.* Ex. L 138, 142 (Dkt. #1-17).  Dr. Reiber testified that the absence of rigor mortis could suggest that the murder took place two to four hours prior to the examination of the body—that is, sometime between 10:30 p.m. on June 7, 1989 and 1:00 a.m. on June 8, 1989.  *Id.* Ex. L 143-45 (Dkt. #1-17).  Nevertheless, Dr. Reiber described the onset of rigor mortis as a "very unreliable" indication of the time of death because "so many different factors" can impact the onset of rigor mortis.  *Id.* Ex. L 123 (Dkt. #1-17).

Dr. Reiber noted that postmortem lividity could suggest an alternative time of death for Spensieri.  She explained that postmortem lividity normally becomes fixed 10 to 12 hours after death.  *Id.* Ex. L 129-31 (Dkt. #1-17).  In the case of Spensieri, postmortem lividity had become fixed by the time of the autopsy.  *Id.* Ex. L 131 (Dkt. #1-17).  That would be consistent with a time of death between 9:00 p.m. and 10:00 p.m. on June 7, 1989.  *Id.* Ex. L 131-32 (Dkt. #1-17).  Even so, Dr. Reiber stressed that the range is "extremely variable" and "depend[s] on the circumstances."  *Id.* Ex. L 131 (Dkt. #1-17).

Ultimately, when Dr. Reiber was asked for her "best estimate" of the time of death, she responded that "my best estimate can't take into account one single [postmortem] parameter." *Id.* Ex. L 146.

## II.    Petitioner's Additional Evidence

Petitioner argues that evidence not presented at his trials calls his conviction into question.

## A.      License-Plate Evidence

After he was convicted, petitioner acquired three pieces of license-plate evidence that he submits to support his habeas petition: (**i**) five pages of documents obtained through public records requests, (**ii**) an affidavit from a witness at petitioner's initial 2001 trial, and (**iii**) an affidavit from a lawyer who prosecuted petitioner.

### 1. Documents Obtained through Public Records Requests

Following his conviction, petitioner made public records requests to the Queens County District Attorney's Office in April and June of 2011. *See id.* Ex. C 7 (Dkt. #1-3). In response, that Office produced five pages of documents on or about May 10, 2013 (the "Public Records Response").[3] *Ibid.*

The first two pages of the Public Records Response appear to be a report from the New York Department of Motor Vehicles ("DMV") prepared by Mary Rosenzweig for Detective Cassie Kim on November 5, 1998. *Id.* Ex. Q 1 (Dkt. #1-23). The report shows that a search in New York DMV records for plate value "XBF877"—the license plate number from before the murder—returned (**i**) a historical header record for Linda J. Ianniello, and (**ii**) a different plate value of 2ER523, corresponding to the license plate number from after the murder. *Id.* Ex. Q 1-2 (Dkt. #1-23). Explanatory language in the report states that the "return of a different plate value indicates that the same vehicle bore the plate being searched or that the plate was transferred from one vehicle to another—2ER523 would have been the later plate on the same vehicle." *Id.*

---

[3]   The parties dispute whether prosecutors disclosed these documents to defense counsel prior to either of petitioner's trials. *See* Pet'r's Mem. 32; Mem. of Law in Opp'n to Pet. for Writ of Habeas Corpus 64 (Dkt. #10) ("Resp't's Mem."). The state court appears to have credited the prosecution's account that "all documents relating to the license[-]plate history, produced in investigation and preparation of trial, were turned over to defense." *Id.* Ex. A 5 (Dkt. #1-1). This "determination of a factual issue made by a State court" is "presumed to be correct," although petitioner could "rebut[] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). I do not resolve this dispute because doing so is not necessary to decide the case.

Ex. Q 1 (Dkt. #1-23).  The report also lists other plates previously associated with Linda J. Ianniello, including 2ER523 but not XBF877.  (Dkt. #1-23, at 1-2.)

The last three pages of the Public Records Response are titled "STARS SYSTEM SCREENS," and appear to show searches of the STARS system conducted on October 12, 2001. *Id.* Ex. Q 3-5 (Dkt. #1-23).  The documents show a search for plate number 2ER523, along with a notation that "Selecting Above Plate Yields Display Showing 4 Collateral Plates But <u>No</u> mention of XBF877," followed by details concerning plate 2ER523.  *Id.* Ex. Q 3 (Dkt. #1-23). The details about plate 2ER523 reveal that (**i**) the plate became effective on June 13, 1989 and expired on October 19, 1991, and (**ii**) the plate was associated with a 1988 red Chevrolet convertible registered to Linda J. Ianniello.  *Ibid.*  Although the document states that four other license plates numbers were associated with 2ER523, none of those plate numbers was XBF877. *Ibid.*

### 2.  The Affidavit of Peter Sammarco

Petitioner also obtained an affidavit from Peter Sammarco that was dated June 5, 2012. *Id.* Ex. F 1, 4 (Dkt. #1-6).  Sammarco was a witness at petitioner's initial 2001 trial but not his 2005 retrial.  *Id.* Ex. F 3 (Dkt. #1-6)*.*  According to the affidavit, Sammarco served as the Assistant to the Director of the New York City Department of Finance, Parking Violations Bureau, from 1986 to 2004 and had also served as a colonel in the Army National Guard.  *Id.* Ex. F 1, 3 (Dkt. #1-6).

Sammarco stated in his affidavit that an investigator from the Queens County District Attorney's Office approached him around October 2001.  *Id.* Ex. F 2 (Dkt. #1-6).  The investigator allegedly asked Sammarco to certify that a copy of the November 12, 1998 license plate history inquiry printout was a record from the STARS database.  *Ibid.*  According to Sammarco, he declined to do so because he could not reproduce the search results through his

9

own search of STARS.  *Ibid.*  Sammarco allegedly found no results when searching STARS for the license plate number from before the murder (XBF877).  *Ibid.*  In fact, Sammarco stated that "the information contained within the November 12, 1998 document could not have existed within or [been] printed out from the STARS database on that date."  *Ibid.*  "In the ordinary course, if no hold is placed on the information, motor vehicle information is purged from the STARS database every [eight] years and [three] months."  *Ibid.*  That means that "[r]egistration activity in October 1988 and June 1989 should therefore have been purged from the database well before November 12, 1998."  *Ibid.*

Sammarco noted in his affidavit that he testified at petitioner's 2001 trial.  *Id.* Ex. F 3 (Dkt. #1-6).  His testimony concerned the results of an October 15, 2001 STARS search he performed on the license plate number from after the murder (2ER523).  *Ibid.*  Sammarco felt comfortable offering this testimony because the STARS database still contained information about plate value 2ER523.  *See ibid.*  The printout of Sammarco's October 15, 2001 search of the STARS system lists other license plate numbers associated with the 1988 red Chevrolet convertible registered to Linda J. Ianniello that at one time bore the license plate number 2ER523.  R. at 155 (Dkt. #12-11).  But the printout does not reference the license plate from immediately before the murder (XBF877).  *Ibid.*.

Sammarco's affidavit explains that Sammarco did not testify at petitioner's 2005 retrial because Sammarco was deployed in Iraq between November 2004 and January 2006.  Aff. of Richard Levitt Ex. F 3 (Dkt. #1-6)  Had he been available to testify in the 2005 retrial, Sammarco allegedly would have again refused to certify the November 12, 1998 plate history printout as a record from the STARS database.  *Ibid.*

Sammarco further stated that ALJ Gotsopoulis could not have herself generated the November 12, 1998 plate-history report from the STARS database in 2005. *Ibid.* Had she done so, Sammarco wrote, a printout with the date of her inquiry would have appeared in the record's upper left corner. *Ibid.* Sammarco said that instead, ALJ Gotsopoulis must have simply "certified the same November 11, 1998 documents from an unknown source, which I had refused to certify in 2001." *Ibid.* He added that "[t]o [his] knowledge, there was no means by which she could legitimately certify or authenticate that this document came from the STARS database." *Id.* Ex. F 3-4 (Dkt. #1-6). Sammarco's affidavit offers the following closing caveat: "I do not purport to make any statement regarding the authenticity or provenance of [the 1998 plate history record]; I state only that it cannot be certified or authenticated as having been generated by the STARS database." *Id.* Ex. F. 4 (Dkt. #1-6).

### 3. The Affidavit of Assistant District Attorney Daniel Saunders

When the State filed its opposition papers to petitioner's state court post-conviction motion on September 24, 2015, the State attached an affidavit from Daniel Saunders explaining the origin of the November 12, 1998 license-plate history. *Id.* Ex. I 1-7 (Dkt. #1-9); *see id.* Ex. H 1, 22 n.9 (Dkt. #1-8); Resp't's Mem. 68. Saunders was the lead prosecutor at petitioner's 2005 retrial and played a role at petitioner's initial trial. *See* Aff. of Richard Levitt Ex. I 1-2 (Dkt. #1-9).

According to Saunders, Julian Yanotti, an investigator from the Manhattan District Attorney's Office with read-only access to the STARS database, looked up information about the red Corvette in November 1998, after the office received a tip from a confidential informant that the individual who murdered Spensieri had been "transported to and from the scene of the homicide in a red Corvette." *Id.* Ex. I 3 (Dkt. #1-9). The investigator allegedly printed out the

results of that inquiry, thereby generating the November 12, 1998 license plate history record printout. *Id.* Ex. I 3-4 (Dkt. #1-9).

Saunders then explained his office's efforts to preserve data about the red Corvette's license plate history. Approximately two weeks after the printout was made, an assistant district attorney from Manhattan allegedly requested that the Department of Finance preserve the information in the November 12, 1998 printout. *Id.* Ex. I 4 (Dkt. #1-9). Three weeks later, Sammarco allegedly informed the assistant district attorney that (**i**) the information was scheduled to be purged from STARS pursuant to normal data-retention policies, but (**ii**) Sammarco had placed a hold which would preserve the data for just over a year. *Ibid.* According to the affirmation, Sammarco explained that prosecutors would have to request an extension if they wished to preserve the data beyond the initial year-long period. *Ibid.* When the case changed hands, however, prosecutors failed to request an extension. *Ibid.*

Saunders explained that before petitioner's second trial, he took the November 12, 1998 record to the Parking Violations Bureau at the Department of Finance and discussed it with staff members. *Id.* Ex. I 6 (Dkt. #1-9). He explained the document's origins and showed them other records from the DMV. *Ibid.* Saunders stated that because representatives of the Department of Finance believed the document to be "an accurate record of their data when it was originally printed, by someone who had no ability to alter their records, they were willing to authenticate it as an accurate record." *Ibid.*

### B.    Ballistics Evidence

Petitioner suggests that certain ballistics documents not introduced at his trial call into question whether the deformed piece of copper jacketing recovered from Spensieri's body was actually from a 9 mm round. *See* Pet'r's Mem. 51; Aff. of Richard Levitt Ex. S 3, 7 (Dkt. #1-25). Prior to petitioner's 2001 trial, prosecutors disclosed ballistics reports to defense counsel that list

12

the fragment as "38 cal." *Id.* Ex. S 2-5 (Dkt. #1-25); *Id.* Ex. D 1-2 n.1 (Dkt. #1-4).  Neither party introduced the reports at trial.  *Id.* Ex. D 1-2 n.1 (Dkt. #1-4).  Prior to petitioner's 2005 trial, the prosecution's ballistics experts prepared a microscopic analysis report that describes the fragment as ".38/9mm." *Id.* Ex. S 7 (Dkt. #1-25); *id.* Ex. C 44 (Dkt. #1-3).  Additionally, a June 16, 1989 receipt documenting a transfer of evidence describes the deformed piece of copper jacketing recovered from Spensieri's body as being .38 caliber.  *Id.* Ex. S 6 (Dkt. #1-25). Prosecutors did not disclose the evidence transfer receipt; petitioner only later obtained it via public records requests.  R. at 83 (Dkt. #12-10); *see* Aff. of Richard Levitt Ex. C 44 n.16 (Dkt. #1-3).

An affidavit filed during the litigation over petitioner's state court post-conviction motion suggests that these references to a .38 caliber fragment are consistent with the trial testimony.  In the affidavit, an assistant district attorney in the Queens District Attorney's Office recounted a June 2015 conversation she had with Delarosa. R. at 56-57 (Dkt. #12-8).  According to the affidavit, Delarosa explained that "three different types of bullets fall under the class of '.38 caliber': .380, .38, and 9mm." R. at 56 (Dkt. #12-8).  Delarosa allegedly told the assistant district attorney that there is no discrepancy between referring to a piece of ballistics evidence as "38 cal." or ".38/9mm." R. at 56-57 (Dkt. #12-8).

### C.    Time-of-Death Evidence

Petitioner invokes an affidavit from Dr. Jean as calling into question the time-of-death evidence at his trial.  Sometime in 2012, petitioner's wife told petitioner that she had located Dr. Jean "by doing a simple Internet search." *Id.* Ex. E ¶ 44 (Dkt. #1-5)  Petitioner's investigator interviewed Dr. Jean the next year, on May 22, 2013.  *Id.* Ex. G ¶ 2 (Dkt. #1-7).  Following the interview, Dr. Jean prepared an affidavit for petitioner.  *Id.* Ex. G (Dkt. #1-7); *see id.* Ex. C 52 (Dkt. #1-3).

Dr. Jean's affidavit explained his whereabouts since he conducted the autopsy. According to a resume attached to the affidavit, Dr. Jean held a series of medical positions in New York after leaving the Office of the Chief Medical Examiner in June 1991. *See id.* Ex. G 2, 5 (Dkt. #1-7). Dr. Jean also stated that he does not recall ever being contacted by the Queens County District Attorney's Office—or any other law enforcement agency—about petitioner's case or Spensieri's death. *Id.* Ex. G 2 (Dkt. #1-7).

Dr. Jean stated that, based on his review of Spensieri's autopsy report, he did perform the autopsy back in 1989. *Id.* Ex. G 2 (Dkt. #1-7). But Dr. Jean stated that he had no specific recollection of the autopsy because it is one of thousands of autopsies he has performed in his career. *Ibid.* Dr. Jean affirmed that, had he testified in petitioner's trials, he would have stated that (**i**) he could not estimate Spensieri's time of death, and (**ii**) "the time of death estimate, if one could be given, was for the crime scene medical examiner to establish." *Id.* Ex. G 3 (Dkt. #1-7).

Finally, Dr. Jean opined on the autopsy documents in the record. After reviewing the autopsy report, the Case Worksheet, and other related documents, Dr. Jean stated that he could not determine what time he performed the autopsy because none of the documents he reviewed indicate the time of the autopsy. *Id.* Ex. G 1-2, 3 (Dkt. #1-7). Dr. Jean also stated that he could not determine who completed the Case Worksheet because it is not signed. *Id.* Ex. G 3 (Dkt. #1-7). But Dr. Jean observed that the Case Worksheet appeared to have been prepared by at least two individuals based on the handwriting on the document. *Ibid.*

## III. Procedural History

Petitioner was indicted for Spensieri's murder in 2000. R. at 157-58 (Dkt. #12) He was convicted by a jury but the verdict was set aside due to juror misconduct. *See People v. Romano*, 8 A.D. 503, 504 (N.Y. App. Div. 2004), *leave to appeal denied*, 818 N.E. 2d 681 (N.Y 2004). Petitioner was retried and convicted of second-degree murder in 2005. Aff. of Richard Levitt Ex.

L 331 (Dkt. #1-18).  He was ultimately sentenced to imprisonment for 18 years to life.  *Id.* Ex. L 353 (Dkt. #1-18).

After the jury returned its verdict, petitioner moved to set aside the verdict under New York Criminal Procedure Law § 330.  *See People v. Romano*, 9 Misc. 3d 1127(A), 2005 WL 3017645 (N.Y. Sup. Ct. 2005).  The trial court denied petitioner's motion on November 9, 2005.  *Id.* at *8.

Petitioner appealed on August 6, 2007.  R. at 150 (Dkt. #12).  Petitioner asserted, among other arguments, that the license-plate-history report should not have been admitted into evidence because it was "obtained by a law enforcement officer from either the internet or an unidentified law enforcement database, but not from the [Parking Violations Bureau]."  R. at 44 (Dkt. #12).  Specifically, petitioner argued that the report entered into evidence "was obtained by Detective Julian Yannotti" on November 12, 1998, and "placed by him in the District Attorney's files where it remained until its existence was finally disclosed to the defense in 2001."  R. at 90 (Dkt. #12).  Petitioner argued that ALJ Gotsopoulis improperly authenticated that document.  R. at 90-91 (Dkt. #12).  Petitioner also pointed out that the State had admitted to Yannotti's involvement at petitioner's first trial.  *See* R. at 91 (Dkt. #12).  There, prosecutors had indicated that Yannotti used the Internet or a "law enforcement database" to obtain the record.  *Ibid.*  The government did not dispute petitioner's account of how the license-plate-history report was created.  *See* R. at 227-35 (Dkt. #12-3).

The Appellate Division affirmed petitioner's conviction and sentence on April 28, 2008.  *People v. Romano*, 50 A.D.3d 1162 (N.Y. App. Div. 2008).  The appellate court stated petitioner's contentions pertaining to the license-plate-history report, among other contentions, were "without merit or do not require reversal."  *Id.* at 1163.

15

Petitioner then sought leave to appeal from the Court of Appeals.  Again, petitioner asserted that the license-plate-history report was obtained not from the Parking Violations Bureau but instead from Yanotti.  R. at 71 (Dkt. #12-4).  Petitioner again argued that it was therefore improper for ALJ Gotsopoulis to authenticate the report or to verify the accuracy and reliability of the report.  R. at 74 (Dkt. #12-4); *see* R. at 97 (raising similar arguments in reply) (Dkt. #12-4).  The government did not contest petitioner's factual assertions.  *See* R. at 90 (Dkt. #12-4).  The Court of Appeals denied petitioner leave to appeal on September 11, 2008.  *People v. Romano*, 896 N.E.2d 106 (N.Y. 2008), *reconsideration denied*, 900 N.E.2d 563 (N.Y. 2008).

Seven years passed without petitioner filing any further motion seeking to overturn his conviction or sentence.  Then, in 2015, petitioner filed a motion to vacate his conviction under New York Criminal Procedure Law § 440.10 in state court.  *See* Aff. of Richard Levitt Ex. C (Dkt. #1-3).  As relevant here, petitioner raised *Brady* and prosecutorial misconduct claims tied to the DMV records regarding the red Corvette that petitioner asserted had not been disclosed, which petitioner had since acquired through the Public Records Response.  *Id.* Ex. C 2, 65-68, 73-82 (Dkt. #1-3).  He also sought a new trial based on the affidavit from Dr. Jean indicating that he was unable to estimate the time of Spensieri's death based on the autopsy he performed.  *Id.* Ex. C 2, 69-71, 112-15 (Dkt. #1-3).

The Supreme Court, Queens County, denied petitioner's motion on April 15, 2016.  *See Id.* Ex. A 13 (Dkt. #1-1).  As relevant here, the court rejected petitioner's *Brady* claims based on the government's failure to produce the license-plate-history documents that petitioner obtained in the Public Records Response.  *Id.* Ex. A 3-6 (Dkt. #1-1).  The court noted that a prosecutor had represented that those documents had been disclosed before trial.  *Id.* Ex. A 5 (Dkt. #1-1).  Moreover, the court concluded, the documents were not exculpatory, because they did not

16

contradict or "disprove[] [the] authenticity" of the plate-history report admitted at trial. *Ibid.* The court rejected the argument that prosecutors had suborned perjury regarding the plate-history report, emphasizing that ALJ Gotsopoulis had never certified that she herself had prepared the document. *See ibid.*

The court also rejected petitioner's argument that he should receive a new trial because Dr. Jean had supplied new information regarding Spensieri's time of death. The court concluded that Dr. Jean's testimony could "have been discovered before trial by the exercise of due diligence." *Id.* Ex. A 12 (Dkt. #1-1). The court also cast doubt on the materiality of that testimony, noting that at trial, Dr. Reiber "had testified that determining the time of death was unreliable because there were many variables." *Ibid.*

The Appellate Division denied leave to appeal on August 30, 2016. *See id.* Ex. B 1 (Dkt. #1-2).

Petitioner filed his federal habeas petition on October 21, 2016. *See* Dkt. #1. Petitioner asserts that prosecutors denied him due process by falsely representing to the trial court that they could not locate for trial the former medical examiner who performed Spensieri's autopsy. *See* Pet'r's Mem. 59. In addition, petitioner alleges that prosecutors deprived him of due process by withholding exculpatory evidence concerning the authenticity of the November 12, 1998 plate-history printout and by knowingly presenting false testimony to authenticate that report. *Id.* at 57-58. Petitioner argues that his petition is timely based on 28 U.S.C. § 2244(d)(1)(D), which allows a habeas claim to be brought within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *See* Pet'r's Mem. 49-50. He also invokes the "actual innocence" gateway for habeas

17

relief, available when no reasonable juror would likely have convicted a petitioner in light of newly available evidence. *Id.* at 50.

## DISCUSSION

The habeas petition is time-barred.  Petitioner's conviction became final in 2008, after which seven years passed without petitioner's seeking any post-conviction relief.  As explained below, no exception to the usual one-year statute of limitations renders this petition timely.

## I.    The Statute of Limitations

In the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress established a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment.  *See* 28 U.S.C. § 2244(d)(1).  AEDPA provides that the limitation period shall run from the latest of:

> A.  The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> B.  The date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> C.  The date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> D.  The date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).  If a "properly filed" application for State post-conviction or other collateral review of the judgment of conviction was "pending" at any time during that one-

18

year period, the time during which that application was pending does not count toward the one-year period.  28 U.S.C. § 2244(d)(2).

Section 2244(d)(1)(A) "provides one means of calculating the limitation with regard to the 'application' as a whole," based on the date of the final judgment.  *Pace v. DiGuglielmo*, 544 U.S. 408, 416 n.6 (2005).  In contrast, the "three other[]" portions of Section 2244(d)(1), "[Section] 2244(d)(1)(B) (governmental interference); [Section] 2244(d)(1)(C) (new right made retroactive); [and Section] 2244(d)(1)(D) (new factual predicate)," "require claim-by-claim consideration."  *Pace,* 544 U.S. at 416 n.6; *see Mayle v. Felix*, 545 U.S. 644, 662 (2005) ("If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.").  While the Second Circuit "has not clearly held whether a separate statute of limitations exists for each claim" that a petitioner raises, "or whether there is a single statute of limitations for the entire petition," *Fellows v. Vt. Comm'r of Corr.*, No. 17-CV-187, 2018 WL 1951156, at *5 (D. Vt. Apr. 25, 2018) (citation omitted), appellate courts outside the Second Circuit have uniformly adopted a "claim-by-claim" approach, *see, e.g.*, *DeCoteau v. Schweitzer*, 774 F.3d 1190, 1192 (8th Cir. 2014); *Zack v. Tucker*, 704 F.3d 917, 921-26 (11th Cir. 2013); *Prendergast v. Clements*, 699 F.3d 1182, 1185-88 (10th Cir. 2012); *Mardesich v. Cate*, 668 F.3d 1164, 1171 (9th Cir. 2012); *Bachman v. Bagley*, 487 F.3d 979, 984 (6th Cir. 2007), *abrogated on other grounds*, *King v. Morgan*, 807 F.3d 154, 157-58 (6th Cir. 2015); *Fielder v. Varner*, 379 F.3d 113, 118 (3d Cir. 2004).  I follow the approach of those courts and the Supreme Court's dicta in *Pace*—first assessing the timeliness of petitioner's application as a whole under Section 2244(d)(1)(A) and then independently assessing the timeliness of each of petitioner's claims under Sections 2244(d)(1)(B)-(D).  *See Pace,* 544 U.S. at 416 n.6.

19

## II.    The Petition Is Untimely

Petitioner has not demonstrated that his claims are timely.

### A.    The Petition Is Not Timely Under Section 2244(d)(1)(A)

The petition is not timely under Section 2244(d)(1)(A).  That subsection provides that one possible start-date for the limitations period on a habeas application is the date on which the petitioner's "judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  If a petitioner does not seek certiorari from the Supreme Court after concluding his or her direct appeals in the state court system, the judgment becomes final when the time for seeking certiorari expires.  *See, e.g.*, *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).  The time for seeking certiorari expires ninety days after the final state court denies discretionary review.  *See* Sup. Ct. R. 13(1).  A timely petition for rehearing with the final state court "will toll the running of the 90-day period for filing a petition for certiorari until disposition of the rehearing petition."  *Young v. Harper*, 520 U.S. 143, 147 n.1 (1997).

There is no dispute that petitioner's habeas application is untimely under Section 2244(d)(1)(A).  Petitioner concluded his direct appeals in the New York state system on November 21, 2008.  *See People v. Romano*, 896 N.E.2d 106 (N.Y. 2008), *reconsideration denied*, 900 N.E.2d 563 (N.Y. 2008).  His 90-day deadline to seek certiorari then passed on February 19, 2009.  *See* Sup. Ct. R. 13(1).  In the following year, petitioner did not pursue any state petition for post-conviction review.  *See* 28 U.S.C. § 2244(d)(2) (providing that any period in which a properly filed state petition for post-conviction review is pending will not be counted toward the limitations period).  Accordingly, the limitations period under Section 2244(d)(1)(A) expired on February 19, 2010.  *See* 28 U.S.C. § 2244(d)(1)(A).  Petitioner did not file the instant habeas petition until October 21, 2016.  *See* Dkt. #1.  Therefore, petitioner can only demonstrate

his claims are timely using one of the alternative methods for calculating the statute of limitations.  *See* 28 U.S.C. § 2244(d)(1).

**B.      Petitioner's Claims Are Not Timely Under Section 2244(d)(1)(D)**

Petitioner contends that his petition is nevertheless timely under Section 2244(d)(1)(D), which permits a claim to be brought within one year of the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  This theory lacks merit.

**1. Petitioner's Claim Regarding Dr. Jean**

Petitioner has failed to demonstrate that his claim pertaining to Dr. Jean is timely under Section 2244(d)(1)(D).  The limitations period for a claim under that provision runs from the date on which its factual predicate "could have been discovered through the exercise of due diligence," 28 U.S.C. § 2244(d)(1)(D), which means "reasonable" diligence, but not "maximum feasible diligence."  *Wims v. United States*, 225 F.3d 186, 190 n.4 (2d Cir. 2000).  The "burden of demonstrating due diligence rests with petitioner."  *Shabazz v. Filion*, 402 F. App'x 629, 630 (2d Cir. 2010) (summary order) (citing *Johnson v. United States*, 544 U.S. 295, 311 (2005)); *see, e.g.*, *Rodriguez v. New York*, No. 16-CV-5615 (JFB), 2017 WL 1655217, at *3 (E.D.N.Y. May 2, 2017).

Petitioner has not demonstrated that he brought his claim pertaining to Dr. Jean's availability within one year of the date on which its factual predicate could have been discovered through due diligence.  Petitioner suggests his claim is timely because he did not acquire an affidavit from Dr. Jean until March 31, 2014.  *See* Pet'r's Mem. 50.  But petitioner's wife found Dr. Jean in 2012 with a "simple search on the Internet," Aff. of Richard Levitt Ex. E ¶ 44 (Dkt. #1-5), and petitioner's investigator interviewed Dr. Jean on May 22, 2013, *id.* Ex. G ¶ 2 (Dkt. #1-7).  With due diligence, petitioner could have reasonably acquired the affidavit from Dr. Jean at

least as early as May 22, 2013—and likely much earlier.  Since petitioner did not take any legal

action until nearly two years after his investigator interviewed Dr. Jean, *see id.* Ex. C 2 (Dkt. #1-

3), he has failed to demonstrate that his claim based on Dr. Jean's affidavit is timely under

Section 2244(d)(1)(D).[4]

## 2.    Petitioner's Claim of Perjured Testimony

Petitioner has not demonstrated that he brought his claim regarding perjured testimony by

ALJ Gotsopoulis within one year of when the factual predicate for that claim "could have been

discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  Petitioner asserts

that ALJ Gotsopoulis committed perjury when she authenticated the plate-history report as a

Department of Finance business record that had been produced from the STARS system.  Pet'r's

Mem. 57; *see* Pet'r's Reply 9-10 (Dkt. #16).  He asserts that the "falsity [of this testimony] was

demonstrated by" the documents obtained in the Public Records Response and the Saunders

affirmation in opposition to his motion for state post-conviction relief.  *See* Pet'r's Mem. 57.

This challenge is not timely under Section 2244(d)(1)(D) because petitioner learned the

factual predicates for his claim of perjurious or false testimony, at the latest, by the time that

petitioner obtained the Sammarco affidavit and the Public Records Response.  Indeed, petitioner

used those materials to press this claim in state post-conviction proceedings.  *See* Aff. of Richard

Levitt Ex. C 81 (Dkt. #1-3) (petitioner's brief in state post-conviction proceedings); *see also id.*

Ex. A 3 (Dkt. #1-1) (state decision rejecting petitioner's argument that prosecutors "misl[ed] the

---

[4]    Petitioner also has not shown that he is entitled to relief under Section 2244(d)(1)(B), which calculates the limitations period from the "date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action," or Section 2244(d)(1)(C), which calculates the limitations period from the "date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review."  28 U.S.C. § 2244(d)(1)(B); *id.* § 2244(d)(1)(C).

court and suborn[ed] perjury" through Gotsopoulis's testimony regarding the plate-history report). The date that petitioner had these materials in hand—May 10, 2013—is therefore the latest possible start date for the limitations period under Section 2244(d)(1)(D). *See Rivas v. Fischer*, 687 F.3d 514, 534 (2d Cir. 2012). But petitioner did not raise the claim in his post-conviction motion in state court until almost two years later, *see* Aff. of Richard Levitt Ex. C 2 (Dkt. #1-3), and he took more than three years to raise the claim in the instant habeas petition, *see* Dkt. #1.

Petitioner does not restart the clock by invoking the Saunders Affirmation. Petitioner suggests that the affirmation strengthens his claim through its description of the provenance of the plate-history report. See Pet'r's Mem. 56. But "new information . . . that merely supports or strengthens a claim that could have been properly stated without the discovery . . . is not a 'factual predicate' for purposes of triggering the statute of limitations." *Rivas*, 687 F.3d at 535. Because petitioner knew the factual predicates for his subornation-of-perjury claim by May 10, 2013, but did not seek relief on his subornation claim within the following year, his claim is not timely under Section 2244(d)(1)(D).

### 3. Petitioner's *Brady* Claim

For similar reasons, petitioner's *Brady* claim is time-barred. Petitioner argues that the documents in the Public Records Response constituted *Brady* material because they undermined the veracity of the November 12, 1998 plate-history report. Pet'r's Mem. 58. But as noted above, petitioner waited for nearly two years after receiving the Public Records Response and the Sammarco affidavit to raise any post-conviction challenge based on those documents. A federal habeas claim based on those documents is therefore time-barred.

A *Brady* claim based on the information in ADA Saunders' affirmation is also time-barred. Petitioner appears to contend that the government's failure to disclose the specific

23

information in the Saunders affirmation regarding the provenance of the 1998 license-plate-history report violated the government's obligations under *Brady*, because those details were favorable to the defense and material to guilt.  *See* Pet'r's Mem. 39-40, 58; Pet'r's Reply 9. Petitioner suggests that the statute of limitations for a *Brady* claim based on the Saunders affirmation could not have started to run until he received the affirmation, because "obviously, we could not have 'discovered' this affirmation prior to ADA Saunders having written it." Pet'r's Reply 7.  Were that so, the petition would be timely, because while more than year passed between the filing of that affirmation on September 24, 2015, *see* Aff. of Richard Levitt Ex. H 1, 22 n.9 (Dkt. #1-8), and petitioner's filing of the instant petition on October 21, 2016, *see* Dkt. #1, the statute of limitations was tolled during most of that time because petitioner was seeking post-conviction review in state court,  *see* 28 U.S.C. § 2244(d)(2).

Still, the question for purposes of Section 2244(d)(1)(D) is not when petitioner received a particular document, but when "the factual predicate of the claim . . . could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  Accordingly, the timeliness of petitioner's *Brady* claim turns on when the petitioner could have, with the exercise of due diligence, discovered the *facts* underlying the claim, not when petitioner actually received a particular document on which he relies in pressing that claim.  *See Rivas*, 687 F.3d at 534, 535 (factual predicate is determined based on when the "vital facts" "underlying the claim were known[] or could with due diligence have been discovered" (citation omitted)); *see, e.g.*, *Stevenson v. Falcone*, No. 17-CV-498 (MPS), 2017 WL 3033129, at *5 (D. Conn. July 17, 2017) (tolling under Section 2244(d)(1)(D) not triggered by receipt of documents alone); *Reyes v. Mance*, No. 09-CV-2066 (CM), 2010 WL 1737806, at *6 (S.D.N.Y. Apr. 23, 2010) (relevant inquiry is when petitioner is on notice of the facts to support a claim, not the date on which

petitioner possessed evidence to support the claim); *DeVeaux v. Schriver*, No. 98-CV-7563 (MBM), 1999 WL 1095580, at *3 (S.D.N.Y. Dec. 3, 1999) (similar).

Applying those principles, any *Brady* claim based on the Saunders affirmation is time-barred.  Petitioner asserts that the Saunders affirmation revealed "for the first time" that Saunders took Yannotti's database printout to the Parking Violations Bureau and explained its history to the staff, who then authenticated it.   Pet'r's Mem. 40; *see id.* at 40-41; Aff. of Richard Levitt Ex. I ¶ 12 (Dkt. #1-9) (describing how Saunders explained the history of the record to the Parking Violations Bureau).   But petitioner knew as early as his first trial that Yannotti—rather than an employee of the Parking Violations Bureau—printed out the license-plate history.  R. at 44 (Dkt. #12); R. at 52 (noting prosecutor's explanation of the provenance of the document at petitioner's first trial, including that the State was not attempting to introduce the printout because it was a "document [an] investigator obtained years ago" and "current custodians of the record cannot certify or authenticate that document because they no longer have that document").

Indeed, in appealing his conviction in 2007, petitioner argued that Yannotti's printout was improperly authenticated by ALJ Gotsopoulis for this reason.   R. at 90-91 (Dkt. #12).   In response, the State never disputed that Yannotti had printed out the record.  Indeed, prosecutors acknowledged that the November 12, 1998 plate-history printout was the same document that the prosecutor stated they would not offer at petitioner's initial trial because it had been printed by an investigator.  *See* R. at 230 n.5 (Dkt. #12-3).   Instead, prosecutors argued on appeal that the license-plate-history document was appropriately admitted because ALJ Gotsopoulis could authenticate the document through her testimony that the record was a printout from STARS—a database maintained by the Department of Finance where she worked. R. at 228 (Dkt. #12-3) (arguing that "[i]t is not necessary to proffer the testimony of the persons actually involved in

25

creating the record[,] . . .  and the fact that persons who . . . made the record do not testify may affect the weight, but not the admissibility" (internal citation omitted)); R. at 235 (Dkt. #12-3) ("[W]hile the witnesses' lack of personal knowledge may be – and was in this case – used by the defense to diminish the weight of the evidence in the eyes of the jury, it is well settled that this will not affect the record's admissibility.")).

Therefore, the "vital fact[]" underlying petitioner's *Brady* claim, *Rivas*, 687 F.3d at 535 (citation omitted)—the fact that Yannotti printed out the report, not someone from the Parking Violations Bureau—was discovered long before the Saunders affirmation was submitted.  *See Stevenson*, 2017 WL 3033129, at *5 (finding petitioner had not satisfied Section 2244(d)(1)(D) where petitioner "was presented with ample information during his criminal trial . . . to pursue his *Brady* . . . claim[]").  The only potentially relevant new fact in the affirmation, Saunders's delivery of the printout to the Parking Violations Bureau, at best "supports or strengthens a claim" about the provenance of the license-plate-history report "that could have been properly stated" without the Saunders affirmation,  *Rivas*, 687 F.3d at 535.  But Section 2244(d)(1)(D) does not toll the limitations period while a petitioner "gathers every possible scrap of evidence that might support his claim."  *Sorce v. Artuz*, 73 F. Supp. 2d 292, 294-95 (E.D.N.Y. 1999) (citation omitted).  Petitioner's claims based on the Saunders affirmation are therefore untimely.[5]

---

[5]    Petitioner also has not shown that he is entitled to relief under Section 2244(d)(1)(B) or Section 2244(d)(1)(C). *See supra* page 22 n.4.

   Nor has petitioner established that his untimely claims are saved by equitable tolling. Courts will equitably toll the statute of limitations for a period of time if the petitioner shows, for the relevant period, "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks and citation omitted). Petitioners "bear[] the burden" of demonstrating they are entitled to equitable tolling.  *Pace*, 544 U.S. at 418. Here, petitioner has failed to meet that burden, because he has not raised an equitable tolling argument, or argued that any "extraordinary circumstance stood in his way and prevented timely filing" of his time-barred claims.  *Holland*, 560 U.S. at 645 (internal quotation marks and citation omitted).

**C.     Petitioner's Untimely Claims Are Not Subject To Review Under the Actual Innocence Exception to AEDPA's Statute of Limitations**

Petitioner argues that even if his petition is untimely, his actual innocence of the murder of which he was convicted excuses his noncompliance with the statute of limitations. *See* Pet'r's Mem. 50-52.  "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass" in the face of the "expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  Petitioner's burden in demonstrating actual innocence is "deliberately demanding." *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (internal quotation marks and citation omitted).  It requires, first, that petitioner adduce "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial." *Ibid.* (citation omitted). The new evidence may be reviewed "regardless of admissibility but with proper consideration for the weight the evidence can bear in light of relevance and reliability." *Id.* at 659.  The second requirement is that the new evidence of innocence be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 657 (citation omitted).  To be clear, the new evidence "need not demonstrate factual innocence to an absolute certainty." *Ibid.* (internal quotation marks and citation omitted).  But it must be sufficiently credible and compelling to allow a federal court to conclude that "more likely than not, in light of the new evidence, no reasonable juror would find petitioner guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *Ibid.* (alteration and citation omitted); *see, e.g.*, *Fabers v. Lamanna*, No. 18-CV-2399 (PKC), 2020 WL 1875288, at *23 (E.D.N.Y. Apr. 15, 2020) (collecting cases supporting the proposition that "[n]ew evidence that merely conflicts with the evidence presented at trial" is insufficient to satisfy the actual innocence standard).

Petitioner claims that three categories of new evidence demonstrate his innocence: (i) Dr. Jean's affidavit; (ii) evidence that a .38 caliber copper jacketed bullet had been removed from Spensieri's head during the autopsy; and (iii) evidence discrediting the November 12, 1998 license plate history printout, including Peter Sammarco's affidavit, the DA Production, and the Saunders affirmation.[6]   *See* Pet'r's Mem. 50-52.   None of these items, either alone or in conjunction with one another, establishes petitioner's innocence.

**Dr. Jean's Affidavit.**  Dr. Jean's affidavit does not supply new evidence in light of which "more likely than not . . . no reasonable juror would find petitioner guilty beyond a reasonable doubt."  *Hyman*, 927 F.3d at 657 (alteration and citation omitted).  Dr. Jean's affidavit indicates that Dr. Jean would have been unable to supply a time of death based on the autopsy.  Aff. of Richard Levitt Ex. G 3 (Dkt. #1-7); *see* Pet'r's Mem. 15.  But the evidence at trial did not suggest that the autopsy did establish Spensieri's time of death with any certainty.  Dr. Reiber conceded at trial that determining the onset of rigor mortis is "very unreliable" because the relevant medical factors are context dependent. Aff. of Richard Levitt Ex. L 123 (Dkt. #1-17). She also explained that range of time for the onset of postmortem lividity is "extremely variable."  *Id.* Ex. L 131 (Dkt. #1-17).  Her response when asked her "best estimate" of Spensieri's time of death was that "my best estimate can't take into account one single [postmortem] factor."  *Id.* Ex. L 146 (Dkt. #1-17).  Therefore, Dr. Jean's affidavit indicating that he would not have been able to supply a time of death is not evidence that would allow a federal court to conclude that "more likely than not, in light of the new evidence, no reasonable juror

---

[6]   Petitioner does not premise his constitutional claims on the ballistics evidence or the Sammarco affidavit.  I assume without deciding that petitioner may argue for actual innocence based on evidence that is not the basis for his constitutional claims.

would find petitioner guilty beyond a reasonable doubt." *Hyman*, 927 F.3d at 657 (alteration and citation omitted).

**Ballistics Evidence.** Petitioner also fails to meet the stringent actual-innocence standard based on ballistics evidence. Petitioner contends that the evidence-transfer receipt he obtained via public records requests show that the deformed copper-jacketing fragment retrieved from Spensieri's head may have been .38 caliber rather than 9 mm. *See* Pet'r's Mem. 51, 51 n.35; *see also* Aff. of Richard Levitt Ex. S 6 (Dkt. #1-25). This would be inconsistent, petitioner argues, with the prosecution's theory that petitioner was the only shooter and that he used only a 9 mm Glock-type firearm. *See* Pet'r's Mem. 51, 51 n.35. But the ballistics expert called at trial allegedly told an assistant district attorney that "three different types of bullets fall under the class of '.38 caliber': .380, .38, and 9mm," and that there is no discrepancy between referring to a piece of ballistics evidence as ".38" or ".38/9mm." R. at 56-57 (Dkt. #12-8). Moreover the jury heard testimony from that expert that he could not definitively say that all the ballistics fragments retrieved—including the deformed piece of copper jacketing—were fired from the same weapon. *See* Aff. of Richard Levitt Ex. L 225 (Dkt. #1-17). Accordingly, the evidence receipt is also not sufficiently "compelling" to qualify for the actual innocence exception. *Hyman*, 927 F.3d at 657.

**Additional Information Concerning the November 12, 1998 License Plate History Printout.** Finally, petitioner has not established it is "more likely than not" that "no reasonable juror would find petitioner guilty beyond a reasonable doubt," *ibid.* (alteration and citation omitted), based upon the evidence he puts forward regarding the 1998 license-plate-history printout. Those documents do not themselves suggest that petitioner was innocent of the murder. Instead, on petitioner's view, they provide a basis to impeach, and potentially exclude, the 1998

29

printout that prosecutors relied on at trial to "corroborate[] Ianniello's testimony that he had followed Romano's orders after the murder and changed the license plate on the red Corvette," Pet'r's Mem. 2.  But even if that 1998 printout had been excluded altogether from trial, the jury would have had before it the account of petitioner's ex-wife, who described petitioner leaving the house with a gun on the night of the murder after becoming enraged by Spensieri's conduct, and returning home with blood on his shirt and face.  Aff. of Richard Levitt Ex. L 61-62, 65-67, 74, 77 (Dkt. #1-16).  The jury would have also had before it Ianniello's testimony that he drove petitioner to Spensieri's home, heard shots fired from the room where petitioner and Spensieri had gone, and saw petitioner disassemble and discard a gun while Ianniello drove petitioner away from Spensieri's home, among other evidence.  *Id.* Ex. L 112, 116-18, 124-32, 135-36 (Dkt. #1-15).  Even had the corroborating license-plate document been excluded—and the additional evidence regarding ballistics and Dr. Jean been known—the Court cannot conclude that it is "more likely than not, in light of the new evidence, no reasonable juror would find petitioner guilty beyond a reasonable doubt."  *Hyman*, 927 F.3d at 657 (alteration and citation omitted).  Accordingly, petitioner may not avail himself of the actual innocence exception to the statute of limitations.

## CONCLUSION

Petitioner's application for a writ of habeas corpus is denied because it is time-barred.

Because petitioner has not made a substantial showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), I also deny a certificate of appealability.

SO ORDERED:

    /s/  Rachel P. Kovner           
RACHEL P. KOVNER
United States District Judge

Dated: May 11, 2022
       Brooklyn, New York